IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

OCIMUM BIOSOLUTIONS (INDIA),
LIMITED and Don A. Beskrone, Chapter 7
Trustee of OCIMUM BIOSOLUTIONS INC.

            Plaintiffs,

     v.

PRESTIGE BIOPHARMA LIMITED,
PRESTIGE BIOPHARMA IDC,

            Defendants.

CIVIL ACTION
NO. 24-691 (JHS)

## <u>OPINION</u>

**Slomsky, J.**                                          **August 25, 2025**

**I.   INTRODUCTION** ................................................................................................ 3

**II.  BACKGROUND** .................................................................................................. 5

  A.   Parties and Relevant Nonparties ......................................................................... 5

  B.   Factual Background .............................................................................................. 6

    1.   Alleged Acts of Misappropriation ................................................................ 10

      a.   Relying on Trade Secrets to Assist
        the Research and Development of PBP1510 ............................................ 10

      b.   U.S. Patent Number 11,046,779 .............................................................. 10

**III. STANDARD OF REVIEW** ................................................................................ 10

**IV.  ANALYSIS** ................................................................................................................ 12

   A.  Plaintiffs Have Plausibly Pled Defendants Knowingly PossessedTrade Secrets
      and Misappropriated Them Under the Defend Trade Secrets Act ("DTSA") ................. 13

     1.  DTSA Claim (Count I) Is Plausibly Alleged ................................................. 13

       a.  The <u>Oakwood</u> Factors ................................................................ 13

       b.  Joint Venture ................................................................................ 17

     2.  Plaintiffs' DTSA Claim Is Not Time Barred ................................................ 18

   B.  Plaintiffs Have Plausibly Pled Defendants Knowingly Possessed Trade Secrets and
      Misappropriated Them Under the Delaware Uniform Trade Secrets Act ("DUTSA").... 19

     1.  DUTSA Claim in Count II Is Plausibly Alleged ........................................... 20

     2.  DUTSA Claim Is Not Time Barred .............................................................. 21

**V.  CONCLUSION** ...................................................................................................... 23

## I.    INTRODUCTION[1]

This case arises from decades-old allegations of trade secret misappropriation of software that analyzes research data to identify compounds that help to treat diseases. Pharmaceutical companies discover new drugs by analyzing a disease process in order to design a product that can reverse or stop its progress. After identifying thousands of potential compounds for drug development, researchers conduct experiments to narrow down which compounds are optimal. The trade secrets alleged here are products identified as the Oncology Datasuite, and its umbrella genomic database, GeneExpress, which was licensed to drug companies to streamline testing in pharmaceutical development. Pharmaceutical companies utilize this technology to save time and resources because it helps them to identify compounds that would be suitable for development of drugs to combat diseases. The Oncology Datasuite is the part of GeneExpress that is used to combat cancer.

Plaintiffs Ocimum Biosolutions (India) Limited and Don A. Beskrone, Chapter 7 Trustee of Ocimum Biosolutions Inc. (collectively, "Ocimum" or "Plaintiffs") claim that Prestige Biopharma Limited and Prestige Biopharma IDC (collectively, "Prestige" or "Defendants") misappropriated their trade secrets by using GeneExpress technology to develop and market drug products. Plaintiffs submit that Prestige's Chief Executive Officer ("CEO") Dr. Sang Seok Koh ("Dr. Koh")—a Korean scientist who had access to Plaintiffs' trade secrets through his prior employment at LG Biomedical Institute ("LG Chem")—has kept and used them to assist entities

---

[1] These facts are sourced from the First Amended Complaint and taken as true at this stage of the litigation.

in Korea, including Defendants, after the agreement for him to use their trade secrets expired.[2] Plaintiffs discovered that Dr. Koh was using the Oncology Datasuite to uncover a Pancreatic Adenocarcinoma Up-regulated Factor ("PAUF") biomarker (an indicator of a person's health or disease) in a March 2, 2009 article in Cancer Science Magazine.

On May 1, 2025, Plaintiffs filed a First Amended Complaint ("FAC") against Defendants alleging: (1) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA" or 18 U.S.C. § 1836) (Count I) and (2) misappropriation of trade secrets under the Delaware Uniform Trade Secrets Act ("DUTSA" or DEL. CODE ANN. TIT. 6 § 2001 (2)) (Count II). (Doc. No. 27.)

On May 29, 2025, Defendants filed a Motion to Dismiss the First Amended Complaint, relying on three arguments in favor of dismissal: (1) Plaintiffs have not met the trade secrets misappropriation standard because Plaintiffs did not plausibly demonstrate that Defendants possessed or used GeneExpress; (2) even if Plaintiffs proved that Defendants possessed GeneExpress, Plaintiffs have not plausibly alleged that Defendants had the requisite knowledge of possession or use of a trade secret; and (3) the claims are time barred based upon the date when Plaintiffs discovered the purported misuse. (Doc. No. 32 at 14-20.) In essence, Defendants contend that because Prestige neither existed nor worked with Dr. Koh for years after he left LG Chem, they could not have appropriated Plaintiffs asserted trade secrets. (Id. at 8.)

For reasons that follow, Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint[3] (Doc. No. 31) will be denied.

---

[2]   LG Biomedical Institute is part of or directly associated with the life science endeavors of LG Chem. They are not the same entity, but will be treated as such for the purposes of this Opinion.

[3]   The Court also considered Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss the First Amended Complaint (Doc. No. 36) and Defendants' Reply (Doc. No. 39).

## II.    BACKGROUND

### A.    Parties and Relevant Nonparties

Plaintiff Ocimum is an entity organized and existing under the laws of India with a place of business in Hyderabad, India.  (Doc. No. 27 at ¶ 1.)  Through an asset purchase agreement, Ocimum acquired the genomics division of Gene Logic Inc. ("Gene Logic"), a company that developed GeneExpress, the genetic database that is licensed to pharmaceutical companies to streamline testing in pharmaceutical development.  (Id. at ¶¶ 21, 109.)  Plaintiff Don A. Beskrone is the chapter 7 trustee for the estate of Ocimum USA.  (Id. at ¶ 2.)

Founded in 2015, Defendant Prestige Biopharma Limited is an entity organized under the laws of Singapore with a place of business in Singapore.  (Id. at ¶ 3.)  Defendant Prestige Biopharma IDC is an entity organized under the laws of South Korea with a place of business in Busan, South Korea.  (Id. at ¶ 4.)  Prestige is a pharmaceutical company that engages in research and development of antibody drugs, biosimilars, and vaccines.[4]

Dr. Koh is currently CEO at Prestige Biopharma IDC.  (Doc. No. 32 at 1.)  Previously, Dr. Koh worked for non-party LG Chem, a company that had licensed Gene Logic's genetic database. (Doc. No. 27 at ¶¶ 32-36.)  Dr. Koh was one of the primary contacts at LG Chem during the time the licensing agreement between LG Chem and Gene Logic was in effect from 2000 to 2003.[5] (Doc. No. 32 at 2-3.)   Dr. Koh first became associated with Defendants in 2017 by entering into a royalty-bearing license associated with his research.  (Doc. No. 27 at ¶ 146.)  In March 2024,

---

[4]    About Us, PRESTIGE BIOPHARMA, https://prestigebiopharma.com/aboutus/ (last visited August 18, 2025).

[5]    The agreement that set the terms for LG Chem to use the Oncology Datasuite component of the GeneExpress has several different names, including LG Chem Agreement, LGC-GL Agreement, and the 2000 Agreement.

5

Defendants announced on LinkedIn that Dr. Koh was CEO of Prestige IDC.  (Id. at ¶ 186.)  Dr. Koh was named as a Defendant when the initial complaint was filed on June 12, 2024 (Doc. No. 2), and he moved to dismiss for lack of personal jurisdiction.  (Doc. No. 13.)  Dr. Koh is not named as a defendant in the FAC.  (See Doc. No. 27.)

### B.    Factual Background

Gene Logic, Plaintiffs' predecessor, spent more than $180 million creating the GeneExpress Product ("GeneExpress"), a genetic biological database used to streamline pharmaceutical development and testing.  (Doc. No. 27 at ¶¶ 21, 24.)  One section of the database is the Oncology Datasuite, which is used for cancer research.  (Id.)  On October 15, 2000, Gene Logic licensed the Oncology Datasuite portion to LG Chem for a period of three (3) years.  (Id. at ¶ 32.)  As part of the licensing agreement, LG Chem employees, including Dr. Koh, understood they were to use the Oncology Datasuite for a limited term, that the contents were confidential, and they were to cease use of the Oncology Datasuite at the termination of the agreement.  (Id. at ¶ 38.)

Gene Logic provided LG Chem with the Oncology Datasuite on a server, believing this Datasuite to be LG Chem's only copy.  (Id. at ¶¶ 48-49.)  On or about December 6, 2002, Gene Logic sent a termination letter consistent with its corporate-wide termination procedures to Dr. Koh as the representative from LG Chem, stating:

> Pursuant to Section 5.2 (a) of the agreement, access to the GeneExpress® Product (Oncology Datasuite and the Gene Logic® Software) is limited to the term of the agreement.  Accordingly, pursuant to Section 7.1 (c), please ship the GeneExpress® Product (all system and data disks containing Gene Logic's oncology data and all software programs, including any APIs) back to my attention by January 15th.  Additionally, please destroy or erase all Gene Logic® data on CD's, hard disks, or tapes that were created or transferred to LG Biomedical Institute during the Term that contain the Oncology data and provide a letter to me certifying such destruction by January 15th.

(Id. at ¶ 55.)

On January 15, 2003, LG Chem and Gene Logic met to discuss contractual termination obligations. (Id. at ¶ 58.) Representatives of LG Chem, including Dr. Koh, assured Gene Logic that it had returned or destroyed the information as required by the termination letter. (Id. at ¶ 59.) Plaintiffs allege, however, that these assurances were false. (Id. at ¶¶ 59-62.) Instead, Plaintiffs contend that LG Chem and Dr. Koh misled Gene Logic by returning hard disks containing the Oncology Datasuite, but Dr. Koh "secretly kept a copy of the Oncology Datasuite, which Dr. Koh continued to use long after the LG Chem agreement expired without paying the required access fee to Gene Logic." (Id. at ¶¶ 59-62, 74.) Plaintiffs allege that, without Gene Logic's permission, Dr. Koh took advantage of the unauthorized data to advance his drug research for years after the license terminated. (Id. at ¶ 65.)

On October 14, 2007, Plaintiffs purchased the genomics division of Gene Logic through an asset purchase agreement. (Id. at ¶ 109.) Plaintiffs continued Gene Logic's confidentiality policies related to its trade secrets. (Id. at ¶ 120.)

In 2007, the Korea Research Institute of Bioscience and Biotechnology ("KRIBB") published an annual report indicating that researchers at the facility discovered the pancreatic adenocarcinoma up-regulated factor ("PAUF") biomarker. (Id. at ¶ 137.) According to the FAC:

> 137. A 2007 annual report from [KRIBB] states that the PAUF biomarker was discovered at its institution in the 2007 timeframe. In particular, the annual report states that "The mining of a DNA microarray expression database allowed us to identify that PAUF is overexpressed in pancreatic cancer and plays an important role in progression and metastasis of the tumor." (emphasis added).[6] That PAUF biomarker discovery involved use of the Oncology Datasuite (which is a microarray expression database), as detailed in the PAUF article and explained below.

_____

[6] Citing 2007 Korea Research Institute of BioScience & Biotechnology Annual Report, KRIBB, https://www.kribb.re.kr/file/2007_annual_report.pdf (at 27).

(Id.)

In 2009, the methods used to discover the PAUF biomarker were published in an online article (the "PAUF article"). (Id. at ¶¶ 121-24.) The PAUF article references the Oncology Datasuite, stating that "combined mining of the above data by GeneExpress Oncology Datasuite . . . and expression levels of PAUF in various malignant neoplasms compared to control tissues are shown in the Supporting Table . . . ." (Id. at ¶ 121.) According to the FAC:

> 145. Based on this procedure, at least one author on the PAUF article used the Oncology Datasuite in 2006 or later to discover the PAUF biomarker. According to Prestige's website, this person was the current CEO of Prestige IDC, Dr. Sang Seok Koh:
>
>> CEO Koh Sang-Seok was the first in the world to discover PAUF (Pancreatic Adenocarcinoma Up-regulated Factor) protein, the therapeutic target of 'PBP1510,' a new pancreatic cancer antibody drug being developed by Prestige Biopharma, in 2009. After first identifying the carcinogenicity of the PAUF gene, CEO Koh is leading the commercialization of new antibody drugs and diagnostics for pancreatic cancer by researching anticancer treatments targeting it. It is extremely rare for the discoverer of a biomarker to continue research for more than 15 years, undergo animal testing, and reach clinical trials. IDC expects that with CEO Koh's inauguration, the establishment of a pancreatic cancer treatment ecosystem, including the commercialization of PBP1510, will be further accelerated, and IDC's role as a control tower for antibody new drug research within the group will be strengthened.

(Id. at ¶ 145. )[7]

In other words, Plaintiffs allege that at least one of its authors used the Oncology Datasuite in 2006 or later. (Id.) The PAUF article lists Dr. Koh as one of sixteen (16) co-authors, and three (3) Gene Logic employees are also identified as co-authors. (Id. at ¶¶ 121, 126.) According to

---

[7] Citing Prestige Biopharma IDC Appoints Sang-Seok Koh, Discoverer of the PAU Proten, as CEO, and Advances Antibody Drug Development Business, PRESTIGE BIOPHARMA, dhttps://prestigebiopharma.com/ko/ir-news/?uid=230&mod=document&pageid=1.

Defendants, Dr. Koh was the primary discoverer of the PAUF biomarker while using the Oncology Datasuite improperly. (Id. at ¶ 145.)

Plaintiffs allege that Prestige "entered a royalty-bearing license" with Dong-A-University and Dr. Koh for technology related to the PAUF article, which was developed using the Oncology Datasuite. (Id. at ¶ 146.) According to the FAC, Dr. Koh's knowledge of the Oncology Datasuite was "imputed" by virtue of the relationship between Dong-A-University, Dr. Koh and Prestige, which was designed to profit from misappropriated trade secrets. (Id. at ¶¶ 147-48.) Defendants received a license to develop and commercialize a product called PBP1510 (Ulenistamab), which is based on information in the PAUF article. (Id. at ¶¶ 150-54.) Defendants hold a United States patent associated with PBP1510. (Id. at ¶ 155.) In March 2022, Prestige announced that it received Orphan Drug and Fast Track Designation by the U.S. Food & Drug Administration for PBP1510, providing seven (7) years of market exclusivity for the drug. (Id. at ¶¶ 159-61.) Further, Defendants are currently sponsoring clinical trials for PBP1510 in the United States. (Id. at ¶ 166.)

In a 2021 interview, Defendants' CEO credited Dr. Koh with PBP1510's discovery. (Id. at ¶ 187.) In March 2024, Dr. Koh was announced as the CEO of Prestige IDC, largely to help Prestige commercialize PBP1510. (Id. at ¶ 186.) Plaintiffs allege that Dr. Koh's prior knowledge of the misappropriated trade secrets is imputed to Defendants through their joint venture or partnership with Dr. Koh. (Id. at ¶¶ 147-48.) On May 7, 2024, Plaintiffs sent a letter to Defendants detailing Plaintiffs' claims. (Id. at ¶ 190.) Based on the letter, Plaintiffs allege that Defendants knew that it could not use the Oncology Datasuite or the results obtained from GeneExpress. (Id. at ¶ 191.)

According to the FAC:

98. Trade secrets at issue here are identifiable at least (A) the Oncology Datasuite, (B) the GeneExpress Product, (C) gene expression and related patient and clinical

9

data contained in the GeneExpress Product, and (D) schema or database management architecture of the GeneExpress Product.

(Id. at ¶ 98.) And, as discussed in more detail below, although not a party to the LG Chem-Gene Logic agreement, Defendants are alleged to have obtained Plaintiffs' trade secrets through Dr. Koh. (Id. at ¶¶ 196-219.)

### 1.    Alleged Acts of Misappropriation

Plaintiffs allege Defendants misappropriated their trade secrets by the following methods.

### a.    Relying on Trade Secrets to Assist the Research and Development of PBP1510

Defendants are developing PBP1510 in collaboration with Dr. Koh based on his research published in the PAUF Article. (Id. at ¶¶ 150-54.) Plaintiffs allege Dr. Koh could not have published the PAUF Article without improperly accessing the Oncology Datasuite, and Defendants could not have developed PBP1510 without Dr. Koh and information in the PAUF Article. (Id.) Thus, Plaintiffs allege that Defendants relied on their trade secrets to create PBP1510. In response, Defendants argue that they did not possess or use GeneExpress. (Doc. No. 32 at 14.) Defendants contend that they used the public information in the PAUF Article to develop PBP1510, and a public document cannot qualify as a trade secret. (Id. at 14-15.)

### b.    U.S. Patent Number 11,046,779

United States Patent No. 11,046770 ("the '779 patent") was granted on June 29, 2021. (Doc. No. 27 at ¶ 155.) Although the '779 patent does not reference Gene Logic, LB Chem, Ocimum, or the Oncology Datasuite, the patent is associated with PBP1510. (Id. at ¶¶ 155, 157.)

## III.    STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted is set forth in Ashcroft v. Iqbal, 556 U.S. 662

(2009). After Iqbal, it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." Id. (quotation marks omitted) (quoting Iqbal, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quotation marks omitted) (quoting Iqbal, 556 U.S. at 678). In assessing the plausibility of a claim, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).

Applying the principles of Iqbal and Twombly, the Third Circuit Court of Appeals in Santiago v. Warminster Township, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (alteration in original) (quoting Iqbal, 556 U.S. at 675, 679). The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to

11

strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

And ordinarily, "[w]hile the language of [Federal Rule of Civil Procedure] 8(c) indicates that a statute of limitations defense cannot be used in the context of a Rule 12(b)(6) motion to dismiss, an exception is made where the complaint facially shows noncompliance with the limitations period . . . ." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.1 (3d Cir. 1994), rev'd on other grounds by Rotkiske v. Klemm, 890 F.3d 422 (3d Cir. 2018) (en banc).

## IV.    ANALYSIS

As noted above, the FAC alleges:  (1) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA" or 18 U.S.C. § 1836) (Count I) and (2) misappropriation of trade secrets under the Delaware Uniform Trade Secrets Act ("DUTSA" or DEL. CODE ANN. TIT. 6 § 2001 (2)) (Count II).  (Doc. No. 27.)

Defendants contend here that these claims should be dismissed because Prestige neither existed nor worked with Dr. Koh for years after he left LG Chem, and thus they could not have appropriated Plaintiffs asserted trade secrets.  They move to dismiss the FAC for three reasons: (1) Plaintiffs have not met the trade secrets misappropriation standards because Plaintiffs do not plausibly demonstrate that Defendants possessed or used GeneExpress; (2) even if Plaintiffs proved that Defendants possessed GeneExpress, Plaintiffs do not plausibly allege that Defendants had the requisite knowledge of possession or use of a trade secret; and (3) the claims are time barred based on when Plaintiffs discovered the purported misuse.  (Doc. No. 32 at 8, 14-20.)  Each argument will be discussed in turn.

### A. Plaintiffs Have Plausibly Pled Defendants Knowingly Possessed Trade Secrets and Misappropriated Them Under the Defend Trade Secrets Act ("DTSA")

#### 1. DTSA Claim (Count I) Is Plausibly Alleged

##### a. The <u>Oakwood</u> Factors

To assert a misappropriation claim under the DTSA, a plaintiff must "demonstrate:  (1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret, (2) that 'is related to a product or service used in, or intended for use in, interstate or foreign commerce[,]' and (3) the misappropriation of that trade secret . . . ."[8]  <u>Oakwood Lab'ys LLC v. Thanoo</u>, 999 F.3d 892, 905 (3d Cir. 2021)

---

[8]    Under 18 U.S.C. § 1839 (5):

(5)"misappropriation" means—
(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(B) disclosure or use of a trade secret of another without express or implied consent by a person who—
(i) used improper means to acquire knowledge of the trade secret;

(quoting 18 U.S.C. § 1839(3), (5)) (internal citations omitted). "In determining whether allegations about the identified information plausibly support its having protected status as a trade secret, courts consider whether the owner of the information 'has taken reasonable measures to keep ... [it] secret . . .'" See id.

First, Plaintiffs assert the existence of trade secrets with independent economic value, which they have taken reasonable measures to keep secret. Plaintiffs identify the trade secrets as the Oncology Datasuite, GeneExpress Product, gene expression and related data in the GeneExpress Product, and schema or database management architecture of the GeneExpress Product. (Doc. No. 27 at ¶ 98.) The independent economic value comes not only from the $180.156 million spent to create the GeneExpress Product, but also from the time- and resource-saving that the technology can provide to pharmaceutical companies, and the potential revenue from licensing of that technology. For example, Plaintiffs allege that KRIBB would have had to obtain a license from Ocimum to access the Oncology Datasuite if Dr. Koh had not just provided it, so Plaintiffs lost current and prospective license fees from KRIBB and others. (Id. at ¶¶ 138-39.) In this manner, Plaintiffs allege that Defendants knowingly took advantage of their trade

---

> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>> (I) derived from or through a person who had used improper means to acquire the trade secret;
>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret.

18 U.S.C. § 1839 (5).

secrets, using Dr. Koh's knowledge to develop PBP1510, thus gaining financially by unfairly using Plaintiffs' technology.  (Id. at ¶¶ 146-54.)

Furthermore, Gene Logic, Plaintiffs' predecessor, took reasonable steps to maintain the secrecy of the GeneExpress Product, including following its standard termination protocols to protect the confidential nature of the technology and maintain the databases associated with the GeneExpress product in secrecy.  (Id. at ¶¶ 50, 85.)  After acquiring the GeneExpress Product and its databases, Plaintiffs maintained the Product in secrecy by including confidentiality provisions in its license agreements.  (Id. at ¶ 120.)  Gene Logic and Plaintiffs also relied on the notice provision in their contracts and monitored the Internet for offending publications that could diminish the value of their confidential technology.  (Id. at ¶ 94.)

Second, Plaintiffs plausibly alleged the next Oakwood factor, that the trade secret "is related to a product or service used in, or intended for use in, interstate or foreign commerce." Oakwood Lab'ys LLC, 999 F.3d at 905.  The Third Circuit defines "use" of a trade secret broadly, encompassing "all the ways one can take advantage of trade secret information to obtain an economic benefit, competitive advantage, or other commercial value, or to accomplish a similar exploitative purpose, such as 'assist[ing] or accelerat[ing] research or development.'"  Id.  at 910. Also under Oakwood, "use" includes "marketing goods that embody the trade secret."  Id. at 909. Construing all inferences in favor of Plaintiffs, Defendants' development of PBP1510 based on Dr. Koh's research could qualify as "use" of a trade secret under the Third Circuit's broad definition.  See 18 U.S.C. § 1839(5); Oakwood, 999 F.3d at 910 (holding "use" of a trade secret, as used in the DTSA's meaning of misappropriation, should be construed broadly).  Additionally, this Court noted in a related case that the patent process inherently indicates "use" of a trade secret under the Third Circuit's broad definition:

> Certainly, a direct reference to Plaintiffs' trade secrets on an application for a United States patent, and the corresponding issuance of said patent, qualifies as a way "one can take advantage of trade secret information." Similarly, the assignment of rights under the aforementioned patent is another way "one can take advantage of trade secret information."

Ocimum Biosolutions (India) Limited v. LG Chemical Ltd., No. 19-2227, 2024 WL 4344742, at

*8 (D. Del. Sept. 30, 2024) (citing Oakwood, 999 F.3d at 910; citations to the record omitted.)

Here, Plaintiffs claim Defendants took advantage of trade secret information by marketing

and patenting PBP1510. (Doc. No. 27 at ¶¶ 155-68.) Defendants created PBP1510 based on the

PAUF Article and Dr. Koh's knowledge, and Dr. Koh created the PAUF article using the Oncology

Datasuite and GeneExpress Product. (Id. at ¶¶ 145, 154, 172.) Accordingly, Plaintiffs have

sufficiently alleged facts proving "use" under the broad Oakwood standard.

Further, Plaintiffs plausibly allege that the trade secret was related to a product in interstate

or foreign commerce. Plaintiffs submitted that Defendants received United States Patent No.

11,046,779 ("the '779 patent"), obtained Orphan Drug and Fast Track Designation, and began

clinical trials in the United States based on PBP1510. (Doc. No. 27 at ¶¶ 155-68.) The clinical

trials are being conducted on patients at the Massachusetts General Hospital and the Ronald

Reagan UCLA Medical Center. (Id. at ¶ 164.) Plaintiffs speculate that Defendants likely will

begin selling PBP1510 in the United States by "mid to late 2026." (Id. at ¶ 183.) Defendants are

currently engaged in commerce across the United States and intend to expand the scope of

commerce as their research continues. (See id. at ¶¶ 155-83.) Therefore, Plaintiffs have plausibly

asserted that Defendants are using a product or service in interstate commerce or intending to do

so, as required by Oakwood.

Finally, regarding the third Oakwood factor, when looking at the facts in a light most

favorable to Plaintiffs and construing inferences in their favor, Plaintiffs have demonstrated

misappropriation of Plaintiffs' trade secrets.  As an initial matter, the PAUF article plausibly reveals a history of misappropriation by Dr. Koh.  (Id. at ¶ 145).  Furthermore, Defendants relied on Dr. Koh's knowledge when developing PBP1510.  (Id. at ¶ 154.)  And Dr. Koh's knowledge about the technology and the fact that he had no legal right to use the trade secrets can be imputed to Defendants given their partnership created in 2017.[9]  (Id. at ¶¶ 146-48.)

### b.    Joint Venture

Plaintiffs plausibly allege that the association between Defendants and Dr. Koh is a joint venture, which means Dr. Koh's knowledge is imputed to Defendants and therefore Defendants knew about and are responsible for the technology that was being misappropriated.  (Doc. No. 27 at ¶¶ 147-48.)  A joint venture is an agreement between two parties, express or implied, in which each member "is considered the agent of the others, so that the act of any member within the scope of the enterprise is charged vicariously against the rest."  United States v. USX Corp., 68 F.3d 811, 826 (3d Cir. 1995) (quoting Pritchett v. Kimberling Cove, Inc., 568 F.2d 570, 579-80 (8th Cir. 1977).  A plaintiff must prove four (4) elements to establish a joint venture:  (1)  the contribution of some asset by each party to a common undertaking, (2) the joint property interest in the venture's subject matter, (3) the right of mutual control of management of the venture, and (4) an agreement to share profits or losses from the venture.  USX Corp., 68 F.3d at 826-27 (citing Inter-City Tire & Auto Ctr., Inc. v. Uniroyal, Inc., 701 F. Supp 1120, 1126 (D.N.J. 1988)).

Regarding the first element, Plaintiffs allege that Dr. Koh, who had access to the Oncology Datasuite, provided information derived from the Datasuite to develop the PAUF protein.  (Doc.

---

[9]    Defendants argue that there is no legal partnership between them and Dr. Koh/Don-A-University, so Dr. Koh's knowledge could not be imputed to Defendants.  (See Doc. No. 32 at 19-20.)  But even an informal partnership implies shared knowledge.

No. 27 at ¶¶ 145, 151, 175.)  Defendants contributed a down payment, milestones, and royalties.

(Id.)  As to the second element, according to Defendants' Semi-Annual Report, both Dr. Koh and

Defendants received commercialization rights and intellectual property ownership to PBP1510.

(Id. at ¶¶ 152-54.)  As to the third and fourth elements, Plaintiffs describe in the FAC a mutual

partnership, insinuating the presence of mutual control and a profit-sharing agreement.  (Id. at ¶¶

146-54.)

Because Plaintiffs adequately allege the Oakwood factors required to assert a

misappropriation of trade secrets claim under the DTSA, and that Defendants had the requisite

knowledge that the technology that included trade secrets was being misappropriated, Count I will

not be dismissed.

### 2.    Plaintiffs' DTSA Claim Is Not Time Barred

Defendants also argue that Plaintiffs' DTSA claim should be dismissed for violation of the

three-year statute of limitations.  Defendants assert that Plaintiffs knew of the purported

misconduct more than three (3) years ago.  (Doc. No. 32 at 16.)  Under the DTSA, a claim must

be brought within three (3) years after the date on which the misappropriation is discovered or, by

the exercise of reasonable diligence, should have been discovered.  18 U.S.C. § 1836(d).  The

DTSA provides three (3) ways to establish a misappropriation occurred:  (1) by proving acquisition

through improper means, (2) by proving disclosure without consent, or (3) by proving use of a

trade secret without consent.  18 U.S.C. § 1839(5); see also Oakwood, 999 F.3d at 907-08.  And,

once again, the Third Circuit has defined "use" of a trade secret broadly, encompassing "all the

ways one can take advantage of trade secret information to obtain an economic benefit, competitive

advantage, or other commercial value, or to accomplish a similar exploitative purpose, such as

'assist[ing] or accelerat[ing] research or development.'"  Oakwood, 999 F.3d at 910.  For the

purpose of the DTSA's limitation period, "a continuing misappropriation constitutes a single claim of misappropriation." Id.

Here, Plaintiffs initially filed suit against Defendants on June 12, 2024. (Doc. No. 2.) Accordingly, to overcome Defendants' argument that their DTSA claim is time barred, Plaintiffs must plead they did not discover LG Chem's misappropriation until some point after June 12, 2021. (Id.) Defendants assert that Plaintiffs were aware for years of Dr. Koh's role in the agreement between LG Chem and Gene Logic, and also aware for years of Dr. Koh's purported misuse. (Doc. No. 32.) In response, Plaintiffs contend that even if they were aware of Dr. Koh's misappropriation, this case is based on Defendants' subsequent use of misappropriated trade secrets. (Doc. No. 36.) According to the FAC, Plaintiffs were unaware of Defendants' misappropriation until Dr. Koh was announced as Defendants' CEO in 2024. (Id. at ¶¶ 150, 186.) In addition, it was only after reading the KRIBB report in the context of the PAUF article, and then becoming aware that Dr. Koh was the new CEO of Prestige in 2024, and that Prestige was developing and patenting PBP1510 that Plaintiffs had notice of wrongdoing on the part of Defendants. (See id.)

Because it is not clear from the allegations in the FAC that the statute of limitations had lapsed on Plaintiffs' claim that Defendants knowingly possessed, used, and therefore misappropriated Plaintiffs' trade secrets under the DTSA, Count I will not be dismissed for untimeliness.

**B. Plaintiffs Have Plausibly Pled Defendants Knowingly Possessed Trade Secrets and Misappropriated Them Under the Delaware Uniform Trade Secrets Act ("DUTSA")**

In addition, Defendants argue Count II should be dismissed because Plaintiffs do not adequately plead a claim for misappropriation under the Delaware Uniform Trade Secrets Act

("DUTSA") or, alternatively, that such a claim is time barred by the DUTSA's three-year statute of limitations. (Doc. No. 32; Doc. No. 27 at ¶¶ 220-30.) The Court will address Defendants' arguments in turn.

### 1. DUTSA Claim in Count II Is Plausibly Alleged

There are four elements of a trade secret misappropriation claim under the DUTSA: (1) a trade secret exists; (2) the trade secret was communicated to the defendant; (3) the communication was made pursuant to an understanding, express or implied, that the secrecy of the information would be maintained; and (4) the trade secret has been misappropriated within the meaning of that term as defined in DUTSA. Alarm.com Holdings, Inc. v. ABS Cap. Partners Inc., No. 2017-0583-JTL, 2018 WL 3006118, at **6-7 (Del. Ch. June 15, 2018); Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC, No. 7866-VCP, 2014 WL 897223, at *13 (Del. Ch. Mar. 5, 2014). The DUTSA defines "misappropriation," in relevant part, as follows:

   a. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

   b. Disclosure or use of a trade secret of another without express or implied consent by a person who:

      1. Used improper means to acquire knowledge of the trade secret; or

      2. At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade [secret] was:

         A. Derived from or through a person who had utilized improper means to acquire it;

         B. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

         C. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]

DEL. CODE ANN. TIT. 6, § 2001(2).  Further, it defines "improper means" to "include theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Id. at § 2001(1).

In light of the similarity between the DTSA and the DUTSA, the arguments for and against dismissal of Plaintiffs' DUTSA claim are identical to those arguments made by the parties when arguing for and against dismissal of Plaintiffs' DTSA claim.  For the same reasons provided above with regard to the DTSA claim, the Court concludes that Plaintiffs have plausibly stated a claim for misappropriation by Defendants under the DUTSA.  Accordingly, the Court will deny Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (Doc. No. 31) on Count II.

### 2.    DUTSA Claim Is Not Time Barred

Because it is not clearly barred under the DUTSA's statute of limitations, Count II will not be dismissed.  Like the DTSA, claims under the DUTSA must be brought within three (3) years after the misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered."[10]  DE. CODE ANN. TIT. 6, § 2006.  "Under Delaware law, the statute of limitations begins to run when a plaintiff has (1) actual notice of the basis for the cause of action or (2) has inquiry notice—i.e., notice of facts from which the basis for the cause of action could

---

[10]  Under the DUTSA, a continuing violation constitutes a single claim of misappropriation.  Id. When determining the period during which the statute of limitations began to run, "[t]he key consideration under the discovery rule is the factual, not the legal, basis for the cause of action. VLIW Tech., LLC v. Hewlett-Packard Co., No. Civ.A. 20069, 2005 WL 1089027, at *13 (Del. Ch. May 4, 2005).  As such, "[i]t does not matter if an aggrieved party does not realize that the use legally constituted a misappropriation of trade secrets [. . .] as long as the party knew the facts which could give rise to such a claim."  Id. (internal quotation marks, citations, and brackets omitted) (emphasis in original).

have been discovered by the exercise of reasonable diligence." RoboticVISIONTech, Inc. v. ABB Inc., 726 F. Supp. 3d 364, 368 (D. Del. 2024).

Here, Plaintiff is separately litigating a case against Dr. Koh's former employer, LG Chem for previous instances of misappropriation. (See Doc. No. 36 at 20.) The instant case is based on Defendants' subsequent use of the misappropriated trade secrets. (Id.) Defendants need to raise their own limitations defense because "[t]he raising of the defense of the statute of limitations … is a personal privilege of the defendant . . . ." Zelson v. Thomforde, 412 F.2d 56, 59 (3rd Cir. 1969). And the timeline Defendants provide in their briefing is based on dates of the prior alleged misappropriation by Dr. Koh while he was at LG Chem. (See Doc. No. 32 at 20-21.)

Here, the PAUF article was made public in 2009, and Plaintiffs point to the 2007 annual KRIBB report, which suggests that Dr. Koh discovered his biomarker independent of any LG Chem employees:

> The mining of a DNA microarray expression database also allowed us to identify many novel genes with therapeutic potential. For example, the development of human antibodies targeting PAUF is underway for therapeutic intervention.

(Doc. No. 36-9 at 16 (emphasis added).) And Plaintiffs explain that:

> the "us" referenced in this report refers to several KRIBB researchers. Other than Dr. Koh, neither of these researchers is listed on the PAUF article. But, according to KRIBB's annual report, these six researchers used "a DNA microarray expression database to identify many novel genes with therapeutic potential." One such novel gene discovered at KRIBB was the PAUF biomarker. When read in view of the PAUF Article, the "DNA microarray expression database" being used for this biomarker research at KRIBB appears to be Ocimum's Oncology Datasuite. One such novel gene discovered at KRIBB was the PAUF biomarker. When read in view of the PAUF Article, the "DNA microarray expression database" being used for this biomarker research at KRIBB appears to be Ocimum's Oncology Datasuite.

(Doc. No. 36 at 22, citing FAC at ¶¶ 137, 140-45; Doc. No. 36-9 at 16.) However, as noted earlier, it was only after reading the KRIBB report in the context of the PAUF article—and then becoming

aware that Dr. Koh was the new CEO of Prestige in 2024 and that Prestige was developing and patenting PBP1510—that Plaintiffs had notice of wrongdoing on the part of Defendants. (Id. at ¶¶ 150, 186).[11]

Accordingly, because it is not clear from the allegations in the First Amended Complaint that the statute of limitations had lapsed on the claim under the DUTSA, Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (Doc. Nos. 31, 32) on Count II will be denied.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (Doc. No. 31) will be denied.  An appropriate Order follows.

---

[11]  Courts in this district (as well as the DTSA) recognize three (3) tolling doctrines that operate to stop the running of a statute of limitations until a plaintiff discovers facts "constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts."  See Coleman v. PricewaterhouseCoopers, LLC, 854 A.2d 838, 842 (Del. 2004) (internal quotation marks omitted.)  One such doctrine is fraudulent concealment, where "an affirmative and independent act of concealment that would divert or mislead the plaintiff from discovering the injury.  Bohus v. Beloff, 950 F.2d 919, 925 (3d Cir. 1991). Plaintiff alleges that a jury could find fraudulent concealment here based on contradictory statements Dr. Koh made about whether Gene Logic's employees assisted with his PAUF biomarker discovery and on correspondence that indicates Dr. Koh may have lied about returning the Oncology Datasuite to Gene Logic.  (Doc. No. 36 at 23-24.)  However, the Court need not address this argument since it finds that the claims are not time barred without tolling.